# In the United States Court of Appeals for the Eleventh Circuit

GARY WALTERS,
*Plaintiff-Appellant,*

v.

FAST A/C, LLC, FLORIDA LIMITED LIABILITY COMPANY, FTL CAPITAL PARTNERS, LLC, FOREIGN LIMITED LIABILITY COMPANY, D.B.A. FTL CAPITAL FINANCE,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 2:19-cv-00070-JLB-MRM (The Hon. John L. Badalamenti)

## OPENING BRIEF OF PLAINTIFF-APPELLANT

DARREN NEWHART
NEWHART LEGAL, P.A.
14611 Southern Blvd., Suite 1351
Loxahatchee, FL 33470
(561) 331-1806

MARIA ALAIMO
VILES & BECKMAN, LLC
6350 Presidential Ct., Suite A
Ft Myers, FL 33919
(239) 334-3933

JENNIFER D. BENNETT
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
jennifer@guptawessler.com

JOANNE GRACE L. DELA PEÑA
GUPTA WESSLER PLLC
2001 K St NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

January 28, 2022                    *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26(b) and Eleventh Circuit Rule 26.1, Appellant hereby discloses the following list of known persons, associated persons, firms, partnerships or corporations that have a financial interest in the outcome of this case, including all subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party in this case:

Alaimo, Maria R.

Alper-Pressman, Wendi

Badalamenti, John Leonard

Bennett, Jennifer D.

Dela Peña, Joanne Grace L.

Fast A/C, LLC, Florida Limited Liability Company

FTL Capital Partners, LLC

Gupta Wessler PLLC

Lewis & Clark Capital

McCoy, Mac Richard

Newhart, Darren R.

Newhart Legal, P.A.

Rowe, Jack D.

Silva, Patricia L.

Twait, Danielle N.

Walters, Gary


Dated: January 28, 2022        */s/ Jennifer D. Bennett*
                                          Jennifer D. Bennett

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant Gary Walters respectfully requests an opportunity to present oral argument in this appeal. This case presents important questions concerning Article III standing. Oral argument will assist the Court in resolving these important legal issues.

# TABLE OF CONTENTS

Statement regarding oral argument ......................................................................... i

Table of citations ........................................................................................... iii

Introduction ................................................................................................. 1

Jurisdictional statement .................................................................................... 3

Statement of the issues ..................................................................................... 3

Statement of the case ....................................................................................... 4

    I.    Statutory background ............................................................................ 4

    II.    Factual and procedural background ........................................................ 7

Summary of argument ..................................................................................... 15

Standard of review ......................................................................................... 16

Argument ................................................................................................... 17

    I.    Mr. Walters suffered an injury in fact ..................................................... 18

    II.    Mr. Walters' injury is fairly traceable to FTL .......................................... 22

        A.    FTL's failure to provide closed-end disclosures was an
            independent, sufficient cause of Mr. Walters' injuries .............. 23

        B.    Fast A/C's concealment of the loan documents is itself
            fairly traceable to FTL because Fast A/C was FTL's agent ....... 27

    III.    Mr. Walters' injuries are redressable by damages ................................. 30

Conclusion ................................................................................................. 31

# TABLE OF CITATIONS

## Cases

*Basko v. Sterling Drug, Inc.*,
  416 F.2d 417 (2d Cir. 1969) ............................................................ 25

*Bennett v. Spear*,
  520 U.S. 154 (1997) .......................................................................... 22

*Bostic v. Georgia-Pacific Corp.*,
  439 S.W.3d 332 (Tex. 2014) ............................................................. 25

*Cahoo v. SAS Analytics Inc.*,
  912 F.3d 887 (6th Cir. 2019) ........................................................... 30

*Casillas v. Madison Avenue Associates, Inc.*,
  926 F.3d 329 (7th Cir. 2019) ........................................................... 20

*Computel, Inc. v. Emery Air Freight Corp.*,
  919 F.2d 678 (11th Cir. 1990) ......................................................... 28

*Coulbourn ex rel. Coulbourn v. Crane Co.*,
  728 F. App'x 679 (9th Cir. 2018) ..................................................... 25

*Cuellar-Aguilar v Deggeller Attractions, Inc.*,
  812 F.3d 614 (8th Cir. 2015) ........................................................... 30

*Elam v. Alcolac, Inc.*,
  765 S.W.2d 42 (Mo. Ct. App. 1988) ................................................. 25

*Fisher v. PNC Bank, N.A.*,
  2 F.4th 1352 (11th Cir. 2021) .......................................................... 30

*\*Focus on the Family v. Pinellas Suncoast Transit Authority*,
  344 F.3d 1263 (11th Cir. 2003) ...................................... 16, 21, 22, 26

*Ford Motor Co. v. Boomer*,
  285 Va. 141 (2013) .......................................................................... 25

*Fox v. Ritz-Carlton Hotel Co., L.L.C.*,
  977 F.3d 1039 (11th Cir. 2020) ....................................................... 30

*GDG Acquisitions LLC v. Government of Belize*,
   849 F.3d 1299 (11th Cir. 2017) ........................................................ 28

*Harris v. Evans*,
   20 F.3d 1118 (11th Cir. 1994) .......................................................... 17

*Holsemback v. State*,
   443 So. 2d 1371 (Ala. Crim. App. 1983) ......................................... 26

*\*Khodara Environmental, Inc. v. Blakey*,
   376 F.3d 187 (3d Cir. 2004) ................................................... 2, 24, 26

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................... 22, 26

*Losch v. Nationstar Mortgage LLC*,
   995 F.3d 937 (11th Cir. 2021) .......................................................... 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 17

*Mourning v. Family Publications Service, Inc.*,
   411 U.S. 356 (1973) ........................................................................... 4

*Muransky v. Godiva Chocolatier, Inc.*,
   979 F.3d 917 (11th Cir. 2020) .......................................................... 20

*Northington v. Marin*,
   102 F.3d 1564 (10th Cir. 1996) ........................................................ 26

*Orton v. Virginia Carolina Chemical Co.*,
   142 La. 790 (1918) ........................................................................... 24

*Oulighan v. Butler*,
   189 Mass. 287 (1905) ....................................................................... 24

*Palm Beach Golf Center-Boca, Inc. v. Sarris*,
   781 F.3d 1245 (11th Cir. 2015) ........................................................ 29

*Pedro v. Equifax, Inc.*,
   868 F.3d 1275 (11th Cir. 2017) ........................................................ 19

*People v. Jennings,*
    50 Cal. 4th 616 (2010) ................................................ 26

*Pinson v. JPMorgan Chase Bank, National Association,*
    942 F.3d 1200 (11th Cir. 2019) .................................. 19

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989) .................................................... 23

*Renteria-Marin v. Ag-Mart Produce, Inc.,*
    537 F.3d 1321 (11th Cir. 2008) .................................. 27

*Reproductive Health Services v. Strange,*
    3 F.4th 1240 (11th Cir. 2021) .................................... 22

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .................................... 17, 18, 19

*State v. Abbott,*
    498 P.2d 712 (Alaska 1972) ...................................... 25

*Stotler & Co. v. Commodity Futures Trading Commission,*
    855 F.2d 1288 (7th Cir. 1988) .................................. 28

*Thomsen v. Rexall Drug & Chemical Co.,*
    235 Cal. App. 2d 775 (Ct. App. 1965) ...................... 24

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) .............................................. 21

*Trichell v. Midland Credit Management, Inc.,*
    964 F.3d 990 (11th Cir. 2020) .................................. 20

**Statutes**

15 U.S.C. § 1601 ............................................................ 4

15 U.S.C. § 1602 ......................................................... 5, 6

15 U.S.C. § 1637 ......................................................... 4, 5

15 U.S.C. § 1638 ......................................................... 4, 5

Depository Institutions Deregulation and Monetary Control Act of 1980,
   Pub. L. No. 96–221, tit. VI, 94 Stat. 132 (1980) .................................................... 6

Florida Stat. § 48.062 ......................................................................................... 11

**Rules**

Fed. R. Civ. P. 56 ................................................................................................. 17

**Regulations**

12 C.F.R. § 1026.6 ............................................................................................... 5

12 C.F.R. § 1026.18 ............................................................................................. 5

16 C.F.R. § 429.1 ................................................................................................. 9

**Other Authorities**

107 Cong. Rec. 7856 (1961) ............................................................................... 1

S. Rep. No. 96–368, 96th Cong., 2d Sess. ....................................................... 6, 7

Money Smart for Older Adults Resource Guide (September 2018),
   https://perma.cc/7LYL-YF9C. ......................................................................... 7

Office of the Attorney General of the State of Florida, Attorney General Moody
   Secures Nearly Half a Million Dollars from HVAC Scheme (Sept. 23,
   2021), https://perma.cc/22A5-QBVP ............................................................. 7

Office of Attorney General of the State of Florida, Attorney General Moody Takes
   Action to Stop A/C Company Ripping Off Florida Seniors (Oct. 2, 2020),
   https://perma.cc/QM9J-5ZCR. ....................................................................... 7

Restatement (3d) of Torts: Physical & Emotional Harm § 27 (2010) .................... 24

**INTRODUCTION**

This case is about the high-pressure, in-home sale of an expensive air conditioning system that the plaintiff didn't need, on credit he couldn't afford—and the lack of federally-mandated disclosures accompanying that sale.

The in-home peddling of pricy, credit-financed home repairs is nothing new. Nor is the "widespread use of techniques to camouflage the cost of credit." 107 Cong. Rec. 7856–60 (daily ed. May 11, 1961) (statement of Sen. Humphrey). To protect consumers against such misleading lending practices, Congress enacted the Truth in Lending Act, which requires lenders to tell consumers clearly and conspicuously how much credit really costs. TILA imposes less stringent disclosure requirements for so-called open-end credit—revolving credit accounts like a standard credit card—and more stringent requirements for closed-end credit—one-time loans for big-ticket items, for which the creditor already knows the total cost. Lenders have long tried to evade TILA's closed-end disclosure requirements by mischaracterizing loans as open-end, when in fact they are really one-time, closed-end transactions.

That's exactly what happened here. A salesperson from Fast A/C, a heating and air conditioning company, showed up at Gary Walters' house, ostensibly to provide a "free cleaning." But instead of a free cleaning, Mr. Walters got a high-pressure sales pitch for expensive new ductwork he couldn't afford. Fast A/C told

Mr. Walters not to worry about the high price of the ductwork; he could get a loan from FTL Capital Finance that would cost only $50 a month. That loan was for $5,500, and the monthly payments turned out to be almost double what Fast A/C promised. Had Mr. Walters known in advance the true cost of the loan, he never would have agreed.

But he couldn't have known the true cost because FTL's loan paperwork didn't include the closed-end disclosures that would have told him that. Even though the credit was a one-time loan for a single purchase, FTL mischaracterized the loan as open-end. And to add insult to injury, Fast A/C—which was FTL's agent in the transaction—concealed the loan paperwork from him. Thus, both FTL and Fast A/C violated the law—and harmed Mr. Walters in the process.

But the district court held that Mr. Walters lacked standing to sue FTL for failing to provide the closed-end disclosures mandated by the Truth in Lending Act. In the court's view, FTL's inadequate disclosures couldn't have caused Mr. Walters' injury because Fast A/C hid those disclosures from him. But, on that reasoning, Fast A/C's concealment also couldn't have caused Mr. Walters' injury because the disclosures were inadequate anyway.

"Article III does not dictate such an absurd result." *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004). To the contrary, longstanding, blackletter law provides that where two actors independently cause the same harm, *both* are

considered the cause of the harm—not neither. FTL and Fast A/C are both causes of Mr. Walters' harm. And he has standing to sue both of them. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331, because this case involves a claim under the federal Truth in Lending Act, 15 U.S.C. §§ 1601−1667f, and its implementing regulation, Regulation Z, 12 C.F.R. part 1026. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291. The district court entered its order granting summary judgment for the defendant on May 13, 2021, Dkt. 120, and it denied Mr. Walters' motion for reconsideration on October 6, 2021, Dkt. 131. Mr. Walters timely filed a notice of appeal on November 2, 2021, Dkt. 132.[1]

## STATEMENT OF THE ISSUES

1. Did the district court err in holding that Mr. Walters suffered no injury in fact, even though he wasted his time and money trying to cancel FTL's loan, his credit suffered, and he experienced emotional distress?

2. Did the district court err in holding that Mr. Walters' injuries were not fairly traceable to FTL?

---

[1] All references to the docket are to the district court docket. Page numbers refer to the page number that appears in the header generated by the district court's electronic filing system.

## STATEMENT OF THE CASE

### I.    Statutory background

The Truth in Lending Act is the culmination of "several years of congressional study and debate" on the need to impose "mandatory disclosure requirements on those who extend credit to consumers in the American market." *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 363 (1973). Congress found that "[b]ecause of the divergent, and at times fraudulent, practices by which consumers were informed of the terms of the credit extended to them," they were unable to make informed credit decisions. *Id.* This lack of information was "inconsistent with the efficient functioning of a free economic system"— consumers couldn't possibly shop around for the best terms if they didn't know what those terms were, and without information about the true cost of credit, consumers ended up taking on debt they could not afford. *Id.* at 364. Congress, therefore, passed the Truth in Lending Act to enable consumers to "compare more readily the various credit terms available" to them and "avoid the uninformed use of credit." 15 U.S.C. § 1601(a).[2]

To that end, TILA imposes disclosure requirements on lenders, designed to enable consumers to make a fully informed decision. *See* 15 U.S.C. §§ 1637, 1638. The required disclosures vary based on the type of credit provided. In particular, the statute imposes different requirements for closed-end and open-end credit. *Compare*

---

[2] Unless otherwise specified, internal quotation marks, citations, emphases, and alterations are omitted from quotations throughout the brief.

15 U.S.C. § 1637 *with id.* § 1638. Closed-end credit is like a car loan: a one-time loan for a specific amount, where the finance charge is divided up and incorporated into regular installment payments. A creditor extending closed-end credit must disclose (1) the amount financed, (2) the finance charge, (3) the sum of the amount financed and the finance charge, and (4) a payment schedule with the number, amount, and timing of the payments required to repay the loan. *See generally* 15 U.S.C. § 1638(a); 12 C.F.R. § 1026.18.

Open-end credit, on the other hand, is like a credit card: It is not limited to funding a particular transaction, but rather can be used repeatedly for whatever the consumer wants to buy. 15 U.S.C. § 1602(j). The consumer's debt, therefore, is not fixed in advance; it's determined by their purchases. *See id.* Similarly, the finance charge is not a single, predetermined up-front fee, but instead a charge imposed on any unpaid balance. *Id.* Unlike closed-end creditors who issue a single loan for a specified purchase, a credit card company *can't* tell a customer in advance the monthly payment that customer will owe, the total amount of financing fees, or how many payments that customer will choose to make—that all depends on what the customer decides to charge. So, unlike closed-end creditors, open-end creditors are not required to make these disclosures. *See* 15 U.S.C. § 1637(a), 12 C.F.R. § 1026.6(b)(2)(i)–(xv).

For this reason, after TILA was enacted, problems arose with "spurious open-end credit"—merchants "styl[ing] what is likely to be a one-time credit extension" as the "purchase on an open end (revolving charge) plan" to avoid having to provide closed-end disclosures. S. Rep. No. 96–368, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 236, 259. To curb this deceptive practice, the Senate Banking Committee proposed that the definition of open-end credit be revised to add the requirement that the merchant "reasonably contemplate repeated transactions." *See id.* In proposing this revision, the Committee specifically called out "home improvement" loans as an example of closed-end credit that was being falsely identified as open-end—a problem the revised definition was intended to remedy. 1980 U.S.C.C.A.N. 236, 260. In 1980, the revised definition was enacted by Congress and signed into law by President Reagan. *See* Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96–221, tit. VI, 94 Stat. 132 (1980).

Thus, for decades, TILA has required that for any loan where a creditor does not "reasonably contemplate repeated transactions," the creditor must provide closed-end disclosures—enabling consumers to know the true cost of the loan before they agree to it. 15 U.S.C. § 1602(j).

## II.     Factual and procedural background

**1.** FTL finances home-improvement loans for heating and air conditioning. Dkt. 104-10 at 2. As the Senate Banking Committee recognized in amending the Truth in Lending Act, such loans are easily abused. *See* 1980 U.S.C.C.A.N. 236, 260. And both state and federal regulators have recognized the problem of companies using high-pressure sales tactics to convince vulnerable—often elderly—consumers to buy expensive home-improvements that they don't need, on credit they can't afford. *See, e.g.*, Money Smart for Older Adults Resource Guide (September 2018) at 79, https://perma.cc/7LYL-YF9C; Office of the Attorney General of the State of Florida, Attorney General Moody Secures Nearly Half a Million Dollars from HVAC Scheme (Sept. 23, 2021), https://perma.cc/22A5-QBVP (announcing consent judgment against ten companies that targeted Floridians with "deceptive, intimidating tactics to sell air-conditioning-related products and services").

That is precisely what happened here. FTL contracted with Fast A/C, a heating and air conditioning company that was recently sued by the state of Florida for "target[ing]" seniors "with high prices for unnecessary services." Office of Attorney General of the State of Florida, Attorney General Moody Takes Action to Stop A/C Company Ripping Off Florida Seniors (Oct. 2, 2020), https://perma.cc/QM9J-5ZCR. Fast A/C went to consumers' homes and sold them high-priced air conditioning products and services, on credit financed by FTL.

Dkt. 104-5 at 2; Dkt. 104-3 at 8, 10. Gary Walters was one of the consumers Fast A/C targeted. Mr. Walters is a 70-year-old veteran with Parkinson's disease, who lives with his wife in their small home in Ft. Myers, Florida. Dkt. 103-3 ¶ 2. Their main source of income is social security. *Id.* ¶¶ 4–5.

In October 2019, a salesperson from Fast A/C visited Mr. Walters at his home ostensibly to perform "a free cleaning" on his air conditioning unit. *Id.* ¶ 6; Dkt. 104-7 at 12. The salesperson—who had neither tools nor cleaning supplies—went into the attic to inspect the unit, and when he returned two minutes later, he told Mr. Walters that the ductwork "was shot"; according to the salesperson, it wouldn't last another two or three weeks. Dkt. 103-3 ¶ 8; Dkt. 104-7 at 12. If Mr. Walters didn't replace it, the salesperson warned, he would "have really bad problems." Dkt. 104-7 at 12. The cost of replacing the ductwork was $5,500—more than Mr. Walters felt comfortable spending—but the salesperson told Mr. Walters that he could secure financing with FTL. Dkt. 103-3 ¶¶ 12–13; Dkt. 104-7 at 12. With FTL's financing, the salesperson said, Mr. Walters would only pay $50 a month, but that "deal" was only good if Mr. Walters agreed to finance that day. Dkt. 103-3 ¶ 14. Reluctantly, Mr. Walters agreed. *Id.* ¶ 13.

Mr. Walters did not fill out any credit application—and he did not see the loan paperwork. Dkt. 103-3 ¶¶ 15, 19, 22, 23. Instead, Fast A/C's salesperson electronically filled out, signed, and submitted a loan application in Mr. Walters'

name—all while concealing the documentation from him. *Id.* ¶¶ 19, 22; Dkt. 104-7 at 12, 16–17.

But even if Mr. Walters had seen the documentation, it would not have helped. It is undisputed that even though the loan was for a single purchase—the ductwork Fast A/C convinced Mr. Walters he so urgently needed—FTL's loan paperwork included open-end, not closed-end disclosures. *See generally* Dkt. 104-5. That's FTL's standard practice: The company admitted that it does not expect consumers to have repeat transactions on its home-improvement loans, but still it does not provide closed-end disclosures. Dkt. 104-3 at 13. The paperwork for Mr. Walters' loan, therefore, didn't state the total amount being financed, the total finance charge, or the monthly payments. *See generally* Dkt. 104-9. If it did, it would have been clear that the monthly payment was far more than the $50 Fast A/C claimed, *see* Dkt. 104-7 at 13. And if he had received these disclosures, Mr. Walters testified, he never would have taken out the loan to begin with. Dkt. 103-3 ¶ 18.

Federal law requires that companies like Fast A/C, which make sales to consumers in their homes, provide a three-day cooling-off period, within which consumers can cancel the transaction. *See* 16 C.F.R. § 429.1. After speaking with his wife, Mr. Walters decided to cancel the ductwork Fast A/C pressured him into buying—and the loan that came along with it. Dkt. 103-3 ¶ 26. So two days after Fast A/C came to his house, Mr. Walters called the company and cancelled the

transaction. *Id.* ¶ 26. Fast A/C, therefore, never actually performed any work. *Id.* ¶ 27.

Still, a month later, Mr. Walters received a bill from FTL, not only charging him for the financing he never received but demanding he pay nearly twice the promised $50 a month. Dkt. 104-7 at 13; Dkt. 103-10 at 3. Mr. Walters contacted FTL and explained that he had cancelled the loan and that Fast A/C had not replaced the ductwork in his home. Dkt. 104-7 at 13; Dkt. 104-1 at 4–5. But instead of immediately canceling the loan, FTL subjected him to a "three-way game of phone tag between himself, Fast A/C, and a customer service representative from FTL." Dkt. 120 at 9; Dkt. 104-6 at 13–14; *see generally* Dkt. 104-1.

Mr. Walters spent months in a back-and-forth with FTL and Fast A/C. Dkt. 103-3 at ¶¶ 26, 28–32; *see generally* Dkt. 104-1. FTL continued to insist that Mr. Walters owed it money for work its contractor never performed, sending Mr. Walters bills and letters threatening repossession. Dkt. 103-3 ¶ 32; Dkt. 103-10 at 1–14. And because Mr. Walters refused to pay for a service he had canceled and that had never been performed, FTL placed a negative account on his credit report. Dkt. 104-10 at 8; Dkt. 103-16 at 1. Because of that negative account, Mr. Walters' credit score dropped, and he was unable to refinance his home or purchase a vehicle. Dkt. 104-7 at 11–12; Dkt. 103-3 ¶¶ 34, 44. He spent money on paper and ink to fax his attorney. Dkt. 103-3 ¶ 39. He suffered emotional distress, including anxiety that he would not

be able to get his credit fixed, fear that he would lose his home, embarrassment and feelings of worthlessness that FTL and Fast A/C had taken advantage of him, and strain on his marriage. *Id.* ¶¶ 40–42, 45–48.

**2.** FTL refused to remedy the problem, and instead repeatedly advised Mr. Walters to get a lawyer. Dkt. 104-1 at 5, 10, 11. With no other choice, Mr. Walters filed this lawsuit. Mr. Walters sued both FTL and Fast A/C, alleging their conduct violated state and federal consumer protection laws. *See generally* Dkt. 30. Mr. Walters alleged that FTL was liable not only for its own misconduct, but also for Fast A/C's misconduct because Fast A/C acted as FTL's agent, and FTL ratified Fast A/C's misconduct. *Id.* ¶¶ 86–101.[3]

After discovery, Mr. Walters moved for partial summary judgment on liability. Dkt. 103. During discovery, FTL had admitted that it does not reasonably expect consumers to make repeated transactions. Dkt. 104-3 at 13. Mr. Walters therefore argued that by failing to provide him closed-end disclosures, FTL violated the Truth in Lending Act as a matter of law. Dkt. 103 at 16–17.

---

[3] After filing his complaint, Mr. Walters attempted to serve Fast A/C at multiple addresses and dates, but Fast A/C repeatedly evaded service. Having exhausted all efforts, Mr. Walters served a copy of the amended complaint on the Secretary of State in accordance with Florida law. *See* Fla. Stat. § 48.062(1)–(3). When Fast A/C still failed to answer the complaint, Mr. Walters moved for a default judgment against it, which the district court granted. *See* Dkt. 58; Dkt. 118.

FTL also moved for summary judgment. Dkt. 104. The company contended that Mr. Walters lacked standing to bring his claims in the first place.[4] Its only argument in support of this contention was that, in FTL's view, Mr. Walters had suffered no injury in fact. *Id.* at 15–16. Even though it had previously admitted reporting a negative account, Dkt. 104-10 at 8, FTL denied that Mr. Walters' credit was negatively impacted, Dkt. 104 at 15–16. The company also denied that its negative credit reporting had prevented Mr. Walters from refinancing his home—despite Mr. Walters' testimony to the contrary, Dkt. 104-7 at 12. And the company contended that, absent financial loss, emotional harm is not an injury in fact. Dkt. 109 at 5. FTL said nothing at all about the time Mr. Walters spent trying to get FTL to stop collecting a debt he did not owe and clear up his credit. *See generally id.* And the company did not dispute that if Mr. Walters had suffered an injury in fact, that injury was fairly traceable to FTL. *See generally id.*

**3.** The district court granted summary judgment for FTL. Dkt. 121 at 2. The court held that Mr. Walters suffered no injury in fact—but not for any reason advanced by FTL. *Id.* at 24–26. Indeed, the court acknowledged that wasted time and negatively impacted credit—the very injuries Mr. Walters suffered—are concrete injuries. *Id.* at 28–29. But the court reasoned that Mr. Walters was not "at any

---

[4] FTL raised additional arguments, but the only issue decided by the district court—and therefore the only issue relevant on appeal—is whether Mr. Walters has standing. *See* Dkt. 121 at 31.

particularized risk of making an uninformed credit decision *due to FTL's failure* to include closed-end disclosures" in the loan documents, because Fast A/C didn't show him those documents in the first place. *Id.* at 26 (emphasis added). In the court's view, any harm suffered by Mr. Walters was therefore due to Fast A/C's concealment of the loan paperwork—not the absence of closed-end disclosures in that paperwork. *Id.* at 25–26. According to the district court, that meant Mr. Walters had suffered no injury in fact at all. *Id.* at 24–26.

The court refused to consider whether Mr. Walters had standing because FTL was vicariously liable for Fast A/C's misconduct. *Id.* at 24 & n.11. Despite the complaint's explicit allegations that Fast A/C was an agent of FTL—and that FTL is vicariously liable for its misconduct—the court held that Mr. Walters had not alleged a Truth in Lending Act claim based on vicarious liability. *Id.*

Mr. Walters moved for reconsideration. Dkt. 122. In his motion, Mr. Walters explained that the court had conflated injury in fact with traceability. *Id.* at 1. As the district court itself recognized, Mr. Walters was concretely harmed. *Id.* at 13. The court's assertion that his harm was not attributable to FTL, Mr. Walters explained, was not an assertion that he lacked injury in fact, but rather that his injury was not fairly traceable to FTL. *Id.* at 13–14. And, Mr. Walters argued, his injury *was* fairly traceable to FTL. *Id.* at 19–23. He explained that this is a case in which the injury is "causally over-determined"—that is, there are multiple wrongdoers, each of whose

conduct would be sufficient, on its own, to cause Mr. Walters' injury. *Id.* at 19–20. In these circumstances, Mr. Walters argued, the law is not that Mr. Walters has standing to sue neither defendant—it's that he has standing to sue both. *Id.* at 20–21.

Mr. Walters also argued that the district court erred in dismissing agency as an alternative basis for standing. *Id.* at 22–23. He pointed out that a whole count of the Second Amended Complaint is devoted to alleging that FTL is vicariously liable for Fast A/C's misconduct based on agency, and that the TILA claim specifically also alleged that "FTL contracted with Fast A/C who at all times acted as its agent." *Id.* (citing Dkt. 30 at ¶¶ 86–101, 136).

The district court denied the reconsideration motion. Dkt. 131. The court insisted that it "did not conflate the elements of standing." *Id.* at 5. Again, the court did not deny that Mr. Walters had been injured. *Id.* at 6. But it reiterated its belief that Mr. Walters had not been injured by FTL's inadequate disclosures, but rather by Fast A/C's concealment of the loan documents. *Id.* In the court's view, that meant Mr. Walters suffered no injury in fact at all. *Id.* at 6. And with respect to agency, the court maintained that Mr. Walters had not actually alleged a vicarious liability-based TILA claim. *Id.* at 3–4.

## SUMMARY OF ARGUMENT

Mr. Walters has standing to sue FTL for its failure to provide the legally-required closed-end disclosures necessary for him to understand the true cost of the loan it offered him.

**I.** Mr. Walters suffered concrete and particularized injuries: He wasted time and money disputing an unlawful loan; his credit was damaged so he couldn't refinance his home or make other credit-backed purchases; and he suffered emotional distress in the form of stress, anxiety, and embarrassment. Nevertheless, the district court held that Mr. Walters suffered no injury in fact because, according to the court, he wasn't injured *by FTL*. But causation is irrelevant to injury in fact. Injury in fact is about whether Mr. Walters suffered concrete and particularized harm; *traceability* is about whether that harm is fairly traceable to the defendant's misconduct. There can be little dispute that Mr. Walters' injuries are both concrete and particularized to him. Injury in fact is, therefore, satisfied.

**II.** Even if the district court had analyzed causation under the proper traceability prong, its decision still would require reversal. Mr. Walters' injuries are fairly traceable to FTL in two distinct ways. *First*, it's well-established that when multiple actors commit independent acts that cause the same harm, causation is attributed to *every* act that would have been sufficient to cause the harm on its own. Here, FTL and Fast A/C caused the same harm: Mr. Walters' ignorance of the true

cost of FTL's loan. And, standing alone, the misconduct of each—FTL's failure to provide closed-end disclosures in its loan documents and Fast A/C's concealment of those loan documents—would have been sufficient to cause Mr. Walters' injuries. Both acts, therefore, are causes of Mr. Walters' injuries. Mr. Walters' injuries, therefore, are fairly traceable to both FTL and Fast A/C.

*Second*, even if—as the district court believed—Fast A/C's concealment of the loan documents was the sole cause of Mr. Walters' injuries, those injuries still would be fairly traceable to FTL because Fast A/C was FTL's agent. The district court refused to even consider agency as a basis for standing because it believed Mr. Walters' complaint did not allege a Truth in Lending Act claim based on agency. But Mr. Walters alleged exactly that. He alleged that Fast A/C concealed the loan documents from him. He alleged that FTL is vicariously liable for Fast A/C's misconduct. And, in the Truth in Lending Act count specifically, he alleged that Fast A/C was FTL's agent. Nothing more was required.

**III.** There's no dispute that Mr. Walters' injuries are redressable through an award of damages.

This Court should reverse.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a summary judgment, including its determinations on standing. *Focus on the Fam. v. Pinellas Suncoast Transit*

*Auth.*, 344 F.3d 1263, 1271 (11th Cir. 2003). "In conducting this examination, [the Court] view[s] the materials presented and all factual inferences in the light most favorable to the non-moving party." *Id.* Summary judgment is only appropriate when there is "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine, material factual dispute." *Id.* at 1271–72.

## ARGUMENT

The goal of Article III standing is to ensure "that litigants have a concrete stake in the outcome of the proceedings such that the issues will be framed properly." *Harris v. Evans*, 20 F.3d 1118, 1123 (11th Cir. 1994). Accordingly, standing has three requirements: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).

All three requirements are easily met here.

## I.    Mr. Walters suffered an injury in fact.

The district court recognized that Mr. Walters suffered concrete harm. But it wrongly believed that FTL's illegal disclosures did not cause that harm. And, in the district court's view, that meant there was no injury in fact in the first place. But injury in fact has nothing to do with causation—that's traceability. As its name suggests, injury in fact is about injury. It requires only that a plaintiff suffered harm that is (1) "concrete" and (2) "particularized." *Spokeo*, 578 U.S. at 339. Both requirements are easily satisfied here.

Mr. Walters' injuries are concrete. Had he received the proper closed-end disclosures, detailing the true cost of FTL's loan, Mr. Walters would never have agreed to the loan in the first place. Dkt. 103-3 ¶ 18. But because he did not receive those disclosures and therefore agreed to the loan, he was forced to spend time disputing the debt while FTL and Fast A/C gave him the run-around. *Id.* ¶ 37. Mr. Walters' credit also took a hit because FTL placed a negative account on his credit report; and because of that lowered credit score he couldn't make other purchases or refinance his house. *Id.* ¶¶ 33–34, 44; Dkt. 104-7 at 12. He spent money to fax documents to his attorney. Dkt. 103-3 ¶ 39. He suffered emotional distress in the form of anxiety and stress caused by the debt. *Id.* at ¶¶ 42–43, 45–49. And when he finally realized he had been misled, he felt exploited, embarrassed, and worthless, *id.* ¶¶ 42–43.

It's well-established that these harms—wasted time and money, negative credit reporting, lost financing opportunities, and emotional distress—are concrete injuries sufficient to support standing. *See Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017) (holding that time lost "attempting to resolve the credit inaccuracies" is injury in fact); *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1207 (11th Cir. 2019) (holding that a negative credit score and denied access to credit amounts to an actual, concrete and particularized injury); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) ("Losch has shown a concrete injury in the form of the emotional distress and time he spent contesting the inaccurate information.").

The district court did not conclude otherwise. Instead, the court held that Mr. Walters' injuries were not particularized to him—that is, they did not affect Mr. Walters "in a personal and individual way." Dkt. 120 at 24–26 (quoting *Spokeo*, 578 U.S. at 339). But that's plainly incorrect. The harm to Mr. Walters *did* affect him "in a personal and individual way." Mr. Walters *himself* was deprived of the closed-end credit disclosures that TILA mandates he receive, and because of that, Mr. Walters *himself* agreed to a loan he would not have agreed to if he had been given the proper disclosures. That loan damaged *Mr. Walters*' credit, required *Mr. Walters* to waste time and spend money, and caused *Mr. Walters* anxiety and embarrassment. These are quintessential particularized harms. *See Pedro*, 868 F.3d at 1280; *Pinson*, 942 F.3d at 1207; *Losch*, 995 F.3d at 943.

The district court rested its contrary holding on its belief that Mr. Walters "was not at any particularized *risk* of making an uninformed credit decision *due to FTL's* failure to include closed-end disclosures"—because, in the court's view, Fast A/C's concealment of the loan documents was the sole cause of Mr. Walters' injuries. Dkt. 120 at 26 (emphases added). There are two problems with this reasoning. *First*, it misunderstands Mr. Walters' injury. Mr. Walters does not rely on the mere *risk* that a consumer *could* be harmed by a creditor's failure to provide closed-end disclosures. Mr. Walters was *actually* harmed. He actually agreed to a loan he could not afford because without the legally-mandated disclosures, he did not know the true cost of FTL's credit. And that debt actually damaged Mr. Walters' credit, required that he waste his time and money, and caused him anxiety and embarrassment.[5]

---

[5] For this reason, this case is nothing like the cases the district court relied on. In *Casillas v. Madison Avenue Associates, Inc.*, for example, the plaintiff "did not allege that [the defendant's] actions harmed or posed any real risk of harm to her interests." 926 F.3d 329, 334 (7th Cir. 2019). Similarly, in *Trichell v. Midland Credit Management, Inc.*, the plaintiffs did not allege that they personally suffered any harm or risk of harm—they alleged that the defendant sent letters that could have misled *other* people, not that they themselves were misled. 964 F.3d 990, 1001 (11th Cir. 2020). And in *Muransky v. Godiva Chocolatier, Inc.*, this Court held that a plaintiff cannot manufacture standing by spending time mitigating a nonexistent risk. 979 F.3d 917, 931 (11th Cir. 2020). Unlike the plaintiffs in *Casillas* and *Trichell*, Mr. Walters has himself suffered actual harm. And unlike the plaintiff in *Muransky*, the time Mr. Walters spent trying to get FTL to stop collecting a debt he did not owe was not a

*Second*, the district court's conclusion that Mr. Walters was not harmed *by FTL* has nothing to do with injury in fact at all. As this Court explained in *Focus on the Family*, injury in fact is about whether the plaintiff was injured, not what caused that injury. *See Focus on the Fam.*, 344 F.3d at 1272. Indeed, *Focus on the Family* rejected the contention that to satisfy the injury-in-fact requirement, a plaintiff must demonstrate that they were injured "*as a result*" of the defendant's misconduct. *Id*. That contention, the Court held, "plainly conflates the first" prong of the standing analysis, injury in fact, with the second, traceability. *Id.*

The district court dismissed *Focus on the Family* as having "little analogical value" here because that case was about a restriction on speech, and this one is about a statutory violation. *See* Dkt. 131 at 8–9. But the basic standing principles *Focus on the Family* articulated do not vary by context: Injury in fact is *always* about whether a plaintiff was concretely harmed, and traceability is *always* about whether that harm is connected to the defendant's misconduct—regardless of the subject matter of the case. *See, e.g.*, *Pedro*, 868 F.3d at 1280 (discussing injury in FCRA context); *Fla. Pub.*

response to a nonexistent risk of future harm—it was a response to the actual harm FTL inflicted by not disclosing the true cost of its loan.

Contrary to the district court's contention, the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), is not "a validation of its order," Dkt. 131 at 8. *TransUnion* held that consumers lacked standing to challenge alerts on their credit reports that weren't disclosed to anyone else and formatting defects that caused them no harm. 141 S. Ct. at 2210, 2213. That is, *TransUnion* holds that consumers who *weren't* harmed lack standing. But, again, here, Mr. Walters *was* harmed.

*Int. Rsch. Grp. Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070, 1085 (11th Cir. 2004) (discussing injury and traceability in a Clean Water Act case); (11th Cir. 2017); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (same, in a fraud, negligent misrepresentation, and unjust enrichment case); *Moody v. Holman*, 887 F.3d 1281, 1286–87 (11th Cir. 2018) (same, for a writ of habeas corpus).

Here, injury in fact is clearly satisfied. As the district court itself seemed to recognize, Mr. Walters suffered concrete harm. And that harm was particularized to him. That's all that is required.

## II. Mr. Walters' injury is fairly traceable to FTL.

Even when properly considered under the traceability prong, the district court's decision violates basic, longstanding causation principles. Traceability—the requirement that a plaintiff's injuries be "fairly traceable to the defendant's acts or omissions"—is not a demanding standard. *See Focus on the Fam.*, 344 F.3d at 1273. A plaintiff need not show that "the defendant's actions are the very last step in the chain of causation," *Bennett v. Spear*, 520 U.S. 154, 169 (1997), or that they proximately caused the plaintiff's injury, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). All that is necessary is that the plaintiff's injuries be "connected with the conduct of which they complain." *Reprod. Health Servs. v. Strange*, 3 F.4th 1240, 1252 (11th Cir. 2021).

Here, this requirement is satisfied twice over. First, *both* FTL's provision of open-end, rather than closed-end, disclosures in its loan documents *and* Fast A/C's concealment of those documents caused Mr. Walters' injury. And second, even if Fast A/C's concealment were the sole cause of Mr. Walters' injury, that injury still would be fairly traceable to FTL because Fast A/C was acting as FTL's agent.

## A. FTL's failure to provide closed-end disclosures was an independent, sufficient cause of Mr. Walters' injuries.

Mr. Walters' injuries here were "causally overdetermined." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989). That is, there were multiple acts, each of which, standing alone, would be sufficient to cause the harm. *See id.* On its own, Fast A/C's concealment of the loan documents would have been sufficient to prevent Mr. Walters from receiving the information he needed to decline the loan. So too would FTL's provision of open-end rather than closed-end disclosures. But, contrary to the district court's conclusion, the result in such cases is not that neither bad actor caused the harm—it's that both did.

As then-Judge Alito has explained, it's "well recognized that but-for causation is problematic in precisely the situation present here," where an injury "is causally over-determined." *Khodara*, 376 F.3rd at 195. If two hunters shoot the same person at the same time, "[b]ut-for causation leads to the absurd conclusion that neither shot was the cause of the victim's demise." *Id.* That, of course, is not the law. A bad actor does not escape liability for causing harm, simply because another bad actor

happened to also cause the same harm. Nor does a plaintiff lose the ability to sue either, simply because they have the misfortune of being harmed by both. *See id.*

To the contrary, it's black-letter law that "if multiple acts occur," and each act is sufficient to cause the plaintiff's injury "in the absence of the other," "*each* act is regarded as a factual cause of the harm"—and the plaintiff can sue each actor. Restatement (3d) of Torts: Phys. & Emot. Harm § 27 (2010) (emphasis added); *see Khodara*, 376 F.3d at 195.

Indeed, for more than a century, across legal contexts, courts have consistently held that in situations like this, every act that independently would have been sufficient to cause the harm is considered its cause—even though some other act was also sufficient. *See, e.g.*, *Oulighan v. Butler*, 189 Mass. 287, 293 (1905) ("[W]here two or more wrongdoers injure another . . . all of which are concurrent and contribute to one wrong, but which might have been caused by each, then . . . they all are jointly or severally liable."); *Orton v. Virginia Carolina Chem. Co.*, 142 La. 790, 795–96 (1918) (holding that a polluting factory was a cause of the plaintiff's injuries, even where other factories also caused the same harm); *Thomsen v. Rexall Drug & Chem. Co.*, 235 Cal. App. 2d 775, 783 (Ct. App. 1965) (holding that a pharmacist caused the plaintiff's injury where he gave her the wrong prescription and her ingestion of those

drugs caused her injury, even though the plaintiff would have suffered the same injury without his error because she overused a different medication).[6]

Thus, if two people negligently set two separate fires, both of which reach a house that then burns down, *each* person has caused the destruction—even though the other's fire would have been sufficient on its own. Restatement (3d) of Torts § 27, cmt. a. If a person is exposed to multiple toxins, or the same toxin multiple times, each source that would be sufficient on its own to cause the plaintiff's injury constitutes a cause of the harm—even if the other sources, too, would have been sufficient without it. *See, e.g.*, *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 429–30 (2d Cir. 1969) (pharmaceutical drugs); *Ford Motor Co. v. Boomer*, 285 Va. 141, 151 (2013) (asbestos).[7] Or if a person is assaulted in jail because a sheriff deputy spread rumors that he was a snitch, that deputy caused the person's injuries—even if other deputies

---

[6] *See also State v. Abbott*, 498 P.2d 712, 727 (Alaska 1972) (explaining that the government's failure to safely maintain an icy and uneven curve of highway would be an independent sufficient cause of the plaintiff's injuries, even if the driver's negligence was also an independent and sufficient cause*); Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 345 (Tex. 2014) (recognizing multiple sufficient causation in asbestos exposure cases where the plaintiff has suffered exposure from multiple sources).

[7] *See also Coulbourn ex rel. Coulbourn v. Crane Co.*, 728 F. App'x 679, 681 (9th Cir. 2018) (asbestos); *Elam v. Alcolac, Inc.*, 765 S.W.2d 42, 174 (Mo. Ct. App. 1988) (toxic plant emissions).

also spread rumors that themselves would have been enough to incite the assault. *Northington v. Marin*, 102 F.3d 1564, 1568–69 (10th Cir. 1996).[8]

The traceability requirement for standing is even "less" demanding than ordinary tort causation. *Focus on the Fam.*, 344 F.3d at 1273; *see Lexmark*, 572 U.S. at 134 n.6. Thus, where there are "two, independent" acts, each of which is sufficient to cause a plaintiff's injury, the injury is necessarily fairly traceable to both acts. *See Khodara*, 376 F.3d at 195. And the plaintiff has standing to challenge both. *See id.* That's precisely the case here. Fast A/C's concealment, on its own, would have been sufficient to cause Mr. Walters' harm. But so too would FTL's failure to provide closed-end disclosures in the first place. Timeworn causation principles, therefore, dictate that Fast A/C and FTL *both* caused Mr. Walters' injury. Necessarily, then, the lower standard of traceability is satisfied.

---

[8] The same principle of multiple sufficient causation applies even in criminal cases. *See, e.g.*, *People v. Jennings*, 50 Cal. 4th 616, 672 (2010) ("In cases in which there may be concurrent causes of death, however, the substantial factor test embodied by [the jury instruction] provides the accurate standard, because it avoids the possibility of jury confusion and prevents each defendant from escaping responsibility when the conduct of one or more others would have been sufficient to produce the same result."); *Holsemback v. State*, 443 So. 2d 1371, 1382 (Ala. Crim. App. 1983) (holding that co-defendants "could both be properly convicted of [the victim's] murder, even though they acted independently, if each inflicted an injury that caused, contributed to, or accelerated [the victim's] death").

**B.      Fast A/C's concealment of the loan documents is itself fairly traceable to FTL because Fast A/C was FTL's agent.**

Even if Fast A/C's concealment of the loan documents were the sole cause of Mr. Walters' injuries, his injuries still would be fairly traceable to FTL—because Fast A/C was acting as FTL's agent.

FTL contracted with Fast A/C to offer financing—and secure customers' agreement to loans—on FTL's behalf. *See* Dkt. 104-3 at 12–13; Dkt. 104-5. FTL vetted Fast A/C, trained it, and provided it access to FTL's system to submit loan applications. Dkt. 104-3 at 8, 9; Dkt. 104-10 at 5, 7, 8. It gave Fast A/C its marketing materials and allowed Fast A/C to use the FTL logo in Fast A/C's email signatures, on its website, and on its materials. Dkt. 104-3 at 10, 11. FTL also tracked Fast A/C's annual sales volume, the loans it sold, and consumer complaints against it. *Id.* at 23, 8–9; Dkt. 104-4 at 2. And FTL provided the loan documents, determined the terms and conditions of the loan, decided whether a consumer was approved for a loan, and assisted Fast A/C with anything it needed throughout the process. *See* Dkt. 104-3 at 9, 42.

That's agency. *See Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1325 (11th Cir. 2008) ("The establishment of an agency relationship requires: (1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent."); *cf. Stotler & Co. v. Commodity Futures Trading Comm'n*, 855 F.2d 1288, 1292–

93 (7th Cir. 1988) (finding an agency relationship where the principal's internal records listed an associated person as a salesman, the company assigned him a salesman number, the principal gave him its own literature and forms to distribute to the people he solicited, and permitted him to place trades directly through the clerks on the floors of the commodities exchange).

FTL also ratified Fast A/C's conduct in this case. *See GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1309 (11th Cir. 2017) ("retention of benefits" of even an unauthorized act demonstrates that "the principal has approved the act and wishes to be bound by it"); Restatement (third) Agency § 4.01 & cmt. D ("[K]nowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction. This is so even though the person also manifests dissent to becoming bound by the act's legal consequences."). FTL accepted the loan Fast A/C sold on its behalf—and continued to try to collect on it—even after Mr. Walters repeatedly informed it that Fast A/C did not do any work on his home, that Fast A/C (not Mr. Walters) completed the credit application itself, that he never saw or signed the loan agreement, and that Fast A/C didn't give him a copy of the loan documents. Dkt. 104-1 at 4, 5, 6−7, 10; Dkt. 103-10 at 1−14; Dkt. 104-6 at 13−14, 17; *cf. Computel, Inc. v. Emery Air Freight Corp.*, 919 F.2d 678, 685 (11th Cir. 1990) (finding evidence of ratification sufficient to defeat summary judgment where the principal accepted an

unauthorized form of payment and "possessed the means to easily verify whether the payments were conforming but . . . chose not to do so").

The district court did not take issue with the legal proposition that under these circumstances, a consumer ordinarily would have standing to sue FTL. Instead, the court held that Mr. Walters did not plead "vicarious liability under [the Truth in Lending Act] for Fast A/C's" actions in his complaint. Dkt. 131 at 3. That's just incorrect. Not only did Mr. Walters plead, in general, that FTL "is vicariously liable for the harms and losses that Fast A/C caused" him; he specifically reiterated FTL's vicarious liability in the TILA count of his complaint, alleging again that Fast A/C "at all times acted as [FTL's] agent." Dkt. 30 at ¶¶ 101, 136.

The district court's objection seemed to be that although Mr. Walters' complaint alleges that Fast A/C "intentionally concealed" the loan documents from him—and although Mr. Walters pleaded that FTL was vicariously liable for Fast A/C's misconduct—he did not reiterate in the TILA count specifically that his theory of vicarious liability was based on this intentional concealment. Dkt. 131 at 3. But this Court has explicitly *rejected* the contention that "a theory of vicarious liability [must] be specifically pled in the complaint." *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 781 F.3d 1245, 1259 (11th Cir. 2015). Mr. Walters was not required to specifically plead a theory of vicarious liability in the complaint *at all*—let alone repeat in the TILA count facts he had already alleged. *See id.*; *Cahoo v. SAS Analytics*

*Inc.*, 912 F.3d 887, 895 n.3 (6th Cir. 2019) (rejecting the argument that allegations made in support of a particular count only apply to that count, because "a federal court may consider an entire complaint to determine whether a plaintiff pleaded plausible claims").

All that's necessary to plead a claim is "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2); *Palm Beach Golf Ctr.-Boca, Inc.*, 781 F.3d at 1260. The complaint's allegations that Fast A/C intentionally concealed the loan documents from Mr. Walters, and that FTL is vicariously liable for its misconduct, are more than sufficient to meet that standard here. Indeed, FTL moved for summary judgment on the merits of Mr. Walters' TILA claim on the basis of agency. *See* Dkt. 104 at 25–26. Clearly, FTL had "fair notice of what the . . . claim is and the grounds upon which it rests." *Palm Beach Golf Ctr.-Boca, Inc.*, 781 F.3d at 1259. That's all that's required. *Id*.

## III. Mr. Walters' injuries are redressable by damages.

There's no dispute that the third prong of Article III standing, redressability, is satisfied here. An award of damages would redress Mr. Walters' injury. *See Fisher v. PNC Bank, N.A.*, 2 F.4th 1352, 1359 (11th Cir. 2021); *Fox v. Ritz-Carlton Hotel Co., L.L.C.*, 977 F.3d 1039, 1047 (11th Cir. 2020); *Cuellar-Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614, 621 (8th Cir. 2015) ("[T]he availability of statutory damages showed that the plaintiffs' injury was redressable.").

**CONCLUSION**

The district court's decision should be reversed.

Respectfully submitted,

*/s/ Jennifer D. Bennett*
JENNIFER D. BENNETT
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

JOANNE GRACE L. DELA PEÑA
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

DARREN NEWHART
NEWHART LEGAL, P.A.
14611 Southern Blvd., Suite 1351
Loxahatchee, FL 33470
(561) 331-1806

MARIA ALAIMO
VILES & BECKMAN, LLC
6350 Presidential Ct., Suite A
Ft Myers, FL 33919
(239) 334-3933

January 28, 2022                    *Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 7,674 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this reply brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2022, I electronically filed the foregoing brief with the Clerk of the Court of the U.S. Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Jennifer D. Bennett
Jennifer D. Bennett